# IN RE MIA M.*
## (AC 32458)

Lavine, Alvord and Stoughton, Js.

Argued February 9—officially released March 15, 2011

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

*David B. Rozwaski*, for the appellant (respondent mother).

*Susmita M. Mansukhani*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, former attorney general, and *Susan T. Pearlman*, assistant attorney general, for the appellee (petitioner).

*Opinion*

LAVINE, J. The respondent mother appeals from the judgment of the trial court terminating her parental rights as to her minor child, M, for failure to achieve a sufficient degree of personal rehabilitation within the meaning of General Statutes § 17a-112 (j) (3) (E).[1] On appeal, the respondent claims that the court's findings that the petitioner, the commissioner of children and families, had proven by clear and convincing evidence that (1) the respondent had failed to achieve such degree of rehabilitation as would encourage the belief that, within a reasonable time considering the age and needs of M, she could assume a position of responsibility in M's life and (2) it is in the best interest of M that the respondent's parental rights be terminated were clearly erroneous.[2] We affirm the judgment of the trial court.[3]

---

[1] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that . . . (3) . . . (E) the parent of a child under the age of seven years who is neglected or uncared for, has failed, is unable or is unwilling to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child and such parent's parental rights of another child were previously terminated pursuant to a petition filed by the Commissioner of Children and Families . . . ."

[2] The attorney and guardian ad litem for M has adopted the position stated in the brief of the petitioner.

[3] The court also terminated the parental rights of M's biological father, who has not appealed from that judgment. In this opinion, the term respondent refers to the respondent mother.

The following procedural history is pertinent. The petitioner filed a motion for an order of temporary custody on August 14, 2009, shortly after M was born. After the court dismissed a prior uncared for petition alleged on different grounds, the petitioner filed a coterminous neglect and termination petition on January 8, 2010. Following a trial to the court on June 7 and 8, 2010, the court terminated the respondent's parental rights as to M in a memorandum of decision filed June 23, 2010.[4] The court waived fees and costs permitting the respondent to file this appeal.

In its memorandum of decision, the court made the following relevant findings of fact. The department of children and families (department) first became involved in the respondent's life following the birth of her older daughter, J. Although the respondent was not psychotic at that time of her lying-in, she had stopped taking her medication prior to J's birth in July, 2008. Members of the hospital staff were concerned with the respondent's difficulty feeding J, her inability to remain focused and her inability to follow directions. The respondent was uncomfortable applying cream to J's diaper rash and interpreted the child's pseudomenstruation to be the result of sexual abuse by the hospital staff. Following consultation with the respondent's conservatrix[5] and hospital physicians and staff, the petitioner obtained an order of temporary custody as to J. The court granted a petition to terminate the respondent's parental rights as to J on January 5, 2010.

The court also found that the respondent was first hospitalized for psychiatric instability when she was nineteen. At the time, she was in a long-term, abusive relationship. She has suffered from pseudocyesis, or

---

[4] The court also adjudicated M to be neglected. The respondent has not appealed from that adjudication.

[5] In January, 2008, the Probate Court appointed a successor conservatrix of the estate and person of the respondent due to her mental illness.

false pregnancy, for many years. Since her first hospitalization for mental illness, the respondent has been hospitalized for numerous mental health issues, which manifest themselves in the form of depression, delusional thoughts, extreme anxiety and aggressive behavior.

The respondent is bonded with her own mother, but their relationship is marked by turbulence. The respondent has been arrested twice since J's birth for incidents of domestic violence involving her own mother. According to the respondent's mother, the respondent was sexually abused by her father. The respondent did not graduate from high school but has earned a general equivalency diploma. She has held various short-term jobs as a day care assistant, karate instructor and nursing home aide and has volunteered at a multipurpose youth center. The respondent relies on social security disability benefits for support and lives alone in a one bedroom apartment.

Rodolfo Rosado, a clinical psychologist, performed a court-ordered psychological evaluation of the respondent in the fall of 2008. Rosado confirmed a prior axis I diagnosis of schizoaffective disorder with paranoid delusions. Rosado also diagnosed, pursuant to a standardized childhood trauma questionnaire, post-traumatic stress disorder resulting from sexual abuse that the respondent had sustained as an adolescent. According to Rosado, the respondent's post-traumatic stress disorder manifested itself in the respondent's irrational reaction to having to apply cream to J's diaper rash and in accusing the hospital staff of having sexually abused the child. The respondent's paranoia manifested itself in psychotic delusions, which were evident in her preoccupation with her upstairs neighbor.[6]

---

[6] The respondent believed that her upstairs neighbor was trying to steal her boyfriend and assisting the department, and had made a hole in the apartment in order to spy on the respondent, among other things.

Rosado observed the respondent interact with J and noted her greatest strengths to be her affection and commitment to the child. The respondent was confident in her capabilities, certain that she would have no problems maintaining rules at home and ensuring J's compliance. Rosado's observations, however, were not dispositive of his conclusions regarding the respondent's ability to parent, as schizoaffective disorder is a thought disorder involving impairment of logic and sensory experience. Schizophrenia involves impairment of logical reasoning, while affective disorders are manifested in emotional responses that do not rationally correspond to exterior circumstances. Affective disorders involve hallucinations and emotional responses that are inappropriate. The respondent's paranoid delusions compel her to act in an irrational way, and her experiences of trauma, evident in post-traumatic stress disorder, impact her present functions, as memories are multisensory. Rosado concluded that the respondent loves J, but he had a profound concern that the respondent might pose a risk to J, if she were to act on an irrational or paranoid thought.

As to a prognosis for the respondent, Rosado opined that cases of early onset schizoaffective disorder, such as the respondent's, are especially difficult to treat. He opined that the respondent's reunification with J could be considered only if the respondent made significant progress based on recommendations from her mental health service providers and therapists. At trial in the present case, Rosado was asked what the respondent would have had to accomplish, since his 2008 evaluation, to encourage a belief that the respondent's reunification with a young child was possible. Rosado would have required a record demonstrating that the respondent had (1) consistent and committed attendance and engagement with all therapy and treatment, (2) an established working relationship with a therapist and

(3) made sufficient progress addressing her sexual abuse so it would not impair her present functioning.

The respondent's mental health records reveal that she has been engaged in treatment at Western Connecticut Mental Health Network (mental health network) since April, 2005, but her engagement has been on and off over the years, punctuated by periods of treatment elsewhere. For several months prior to and after M's birth, the respondent was being monitored by the mental health network, which was bare minimum treatment. In September, 2009, the respondent transferred her treatment to Catholic Charities. Her transition, however, was not smooth. She arrived late for her first appointment and, therefore, was not able to complete the intake assessment form at that time. The respondent was confrontational with staff regarding the difficulty she had completing the intake assessment. Ordinarily, the intake assessment requires one or two sessions; the respondent and her therapist needed six sessions to complete it. Moreover, the respondent's transition to Catholic Charities was interrupted when her mental health deteriorated, requiring that she be hospitalized.

The Catholic Charities intake assessment revealed that the respondent had psychotic symptomatology, including delusions, and multiple indicia of manic symptomatology, including expansive or elevated mood, inflated self-esteem, grandiosity, reduced need for sleep, pressured speech, excessive energy, flight of ideas, racing thoughts, distractibility, impulsivity and risky behaviors. During her six month engagement with Catholic Charities, the respondent had eighteen therapeutic sessions. The respondent attended the sessions consistently but frequently arrived late and left early after becoming angry. Diane Smith, the respondent's therapist, reported that the respondent was not focused during therapy sessions, as she was preoccupied with thoughts of her upstairs neighbor. In addition, the

respondent was noncompliant with her medication, which the respondent complained caused her to gain weight. To ensure that the respondent took her medication, Catholic Charities utilized the services of visiting nurses from Patient Care, who went to the respondent's home to administer medication. The respondent, however, refused to let the nurses enter her home. Following a meeting in January or February, 2010, the respondent agreed to let a Patient Care nurse administer her medication via injection. That agreement did not last long, as the respondent pulled a syringe out of her arm as the nurse was administering an injection. Catholic Charities thereafter recommended that the respondent receive inpatient treatment, which she refused. Catholic Charities indicated that the respondent needed a higher level of treatment than it was able to provide and recommended that she receive intensive outpatient treatment at the Community Center for Behavioral Health (community center) at a nearby hospital. Catholic Charities discharged the respondent from its treatment program in March, 2010. Smith testified that, during the six months that she treated the respondent, she saw no improvement in the respondent's mental health. Smith opined that the respondent was motivated to attend therapy sessions to satisfy the department but that she was not willing to engage fully in her treatment.

The respondent completed a behavioral health assessment at the community center on March 23, 2010. The assessment characterized her general appearance, behavior, speech, mood, affect and thought process as abnormal, noting her agitated manner, garish makeup, loud pressured voice, angry mood, disorganized thoughts and preoccupation with the department. The respondent's assessment revealed an axis I diagnosis of schizophrenic paranoid and an axis II diagnosis of personality disorder, not otherwise specified. At trial, Virginia Cameron, the respondent's community center

therapist, testified that she had seen the respondent five times. Cameron, however, had recommended that the respondent undergo intensive outpatient treatment, which would require three therapy sessions a week. The respondent declined intensive outpatient therapy, opting instead for a more flexible schedule that ranged from one session per month to one per week.

At the time of trial, the respondent was taking Geodon, an antipsychotic medication, and had been compliant with the medication since transferring her care to the community center. The community center also engaged the services of Patient Care to administer the medication to the respondent in her home. Stina C. Reed, a registered nurse employed by Patient Care, had administered the respondent's medication to her every afternoon Monday through Friday since March 28, 2010, and prepared her bedtime medication. The respondent took her midday medication in Reed's presence, but Reed did not observe whether the respondent took her medication at bedtime.[7] In addition to administering medication to the respondent, the Patient Care nurses were required to make a quick assessment of the patient during each visit. According to Reed, the respondent's apartment is well kept and she demonstrates good hygiene and dietary habits. On two occasions, however, Reed observed the respondent angrily confront her upstairs neighbor. The respondent accused the neighbor of stealing her boyfriend or being involved with the department's removal of her children. The respondent moved to an apartment in a different condominium complex after the landlord refused to renew her lease due to her ongoing conflicts with other residents.

The court found that the department had offered the respondent the following services toward her rehabilitation: (1) supervised visits with both J and M, (2) intensive family preservation services through Catholic

---

[7] Another Patient Care employee arrives at the respondent's home in the morning to administer the medication that the respondent takes at that time.

Charities, (3) parenting education classes through a regional child advocacy center, (4) anger management services, (5) mental health case management services and monitoring through the mental health network, (6) mental health case management services and monitoring though Catholic Charities, (7) outpatient therapy through a mental health association in her community, (8) mental health treatment through a hospital based community center for behavioral health, (9) prenatal care through a women's center and (10) crisis intervention and inpatient treatment in a hospital.

As to the child, the court found that at the time of trial, M was approximately ten months old. She had been placed in foster care upon discharge from the hospital following her birth. Although she is in good health and has no chronic medical issues, she began to exhibit minor developmental delays manifested as tightness in her muscles resulting in her having difficulty sitting up. She receives physical therapy from the Birth to Three program. Otherwise, she eats and sleeps well and has adjusted to her foster parents with whom she is bonded. M's foster parents, however, are not an adoptive resource for her. Her paternal uncle in Mexico has come forward as an adoptive resource for M and her older sister, J. A department study of the uncle's home was favorable as to M's needs.

After finding that M was neglected,[8] the court turned its attention to the termination petition. In adjudicating

---

[8] With respect to the neglect petition, the court found that at the time the operative neglect petition was filed, it was established conclusively, on the basis of the respondent's mental health, that she was unsuitable for the care and custody of a young child and a danger to such child's safety and welfare. By January, 2010, the respondent had made little to no progress in her treatment, was noncompliant with medication and had not met any of the benchmarks set by Rosado to consider reunification. Pursuant to General Statutes § 46b-120 (8) (c), the court found that M has been neglected in that she has been permitted to live under conditions, circumstances or associations injurious to her well-being.

that petition, the court found by clear and convincing evidence that the department, pursuant to § 17a-112 (j) (1), had made reasonable efforts to reunify the respondent with M.

The court noted the standard applicable to terminations under § 17-112 (j) (3) (E): "The critical issue is whether the parent has gained the ability to care for the particular needs of the child at issue." (Internal quotation marks omitted.) *In re Mariah S.*, 61 Conn. App. 248, 261, 763 A.2d 71 (2000), cert. denied, 255 Conn. 934, 767 A.2d 104 (2001). Before the court may terminate parental rights, it must find "by clear and convincing evidence, that the level of rehabilitation [that the parent has] achieved, if any, falls short of that which would reasonably encourage a belief that at some further date she can assume a responsible position in her child's life." (Internal quotation marks omitted.) *In re Melody L.*, 290 Conn. 131, 149, 962 A.2d 81 (2009). The court should consider all potentially relevant evidence, no matter the time to which it relates. *In re Anna Lee M.*, 104 Conn. App. 121, 128, 931 A.2d 949, cert. denied, 284 Conn. 939, 937 A.2d 696 (2007).

The court found that the respondent loved and was devoted to M but noted that a strong loving bond in and of itself is not sufficient to prevent termination of parental rights. See *In re Anthony H.*, 104 Conn. App. 744, 762–63, 936 A.2d 638 (2007), cert. denied, 285 Conn. 920, 943 A.2d 1100 (2008). Pursuant to Rosado's testimony, the respondent's reunification was viable only if she were to demonstrate progress in three respects: (1) consistent and committed attendance and engagement with all therapy and treatment, (2) an established working relationship with a therapist and (3) sufficient progress in addressing the issue of her early sexual abuse so that it did not impair her present functioning.[9] In

[9] Compare *In re Anthony H.*, supra, 104 Conn. App. 761–62 (preconditions for considering return of children).

considering whether the respondent had satisfied those criteria, the court considered critical events that transpired between the time of Rosado's 2008 evaluation and the time of trial, particularly events that took place during the ten months since M's birth. In that regard, the court made the following findings.

The respondent's compliance with mental health treatment faltered after Rosado's 2008 evaluation was completed. At the time M was born, the respondent was noncompliant with her medication and was receiving mental health treatment at a monitoring level only. Shortly after M's birth, while she was attempting to change mental health care service providers, the respondent's mental health deteriorated, requiring inpatient treatment for the second time within one year. The respondent received treatment from Catholic Charities from October, 2009, until March, 2010, but never fully engaged or committed herself to treatment and was noncompliant with medication. According to Smith, the respondent made no progress within the time she treated with Smith. In March, 2010, the respondent again changed service providers.

Moreover, the court found that, within sixty days of trial, Cameron recommended to the respondent that she enter inpatient treatment or undertake intensive outpatient treatment. The respondent declined both forms of treatment. Although the respondent was compliant with her medication regimen during the six weeks prior to trial, the court found that length of time insufficient to encourage the belief that she would continue to be compliant in view of her record during the two years that the department had been monitoring her. Moreover, the respondent still suffers from the manifestations of her mental illness. Reed witnessed two incidents in which the respondent engaged in an angry confrontation with her upstairs neighbor. In November, 2009, the respondent was arrested for an incident of

domestic violence involving her mother. The court concluded that at the time of trial in June, 2010, the respondent was no closer to being able to parent M safely than she was able to parent J safely in October, 2008.

The court ultimately found by clear and convincing evidence that M is younger than seven years of age and was found in a prior proceeding to have been neglected or uncared for. It also found that the respondent has failed or is unwilling to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of M, the respondent could assume a responsible position in M's life. The court further found that the respondent's parental rights as to another child previously had been terminated pursuant to a petition filed by the petitioner.

With respect to the dispositional phase of the termination proceeding, the court made the findings required by § 17a-112 (k).[10] Thereafter, the court found by clear and convincing evidence that termination of the respondent's parental rights as to M was in the best interest of the child. In making this finding, the court considered

[10] The court found the following facts pursuant to § 17a-112 (k): the respondent was offered weekly supervised visits with M in conjunction with parenting skills training, anger management, mental health treatment and monitoring in a timely and appropriate fashion; the department made reasonable and appropriate efforts to reunite the respondent with M; the respondent failed to avail herself of all of the services that were offered and ordered as preliminary steps in the neglect proceeding; M, at the time of trial, was approximately ten months old and had been in the petitioner's care since she was one day old and living with a foster family with whom she has developed a bond; M interacts well with the respondent; the respondent consistently exercised her rights of visitation and she has participated in and completed parenting education, but she has failed to achieve such degree of personal rehabilitation with respect to her mental health issues as would encourage the belief that, within a reasonable time, considering the age and needs of M, she could assume a responsible position in the child's life; nothing has prevented the respondent from maintaining a meaningful relationship with M; there has been no unreasonable conduct on the part of department personnel; the department and service providers have offered the respondent extensive support.

M's age, growth, development, need for stability, length of stay in foster care, the nature of her relationship with her foster family and with her biological family, the degree of contact the respondent maintained with M and their biological bond. Compare *In re Alexander C.*, 60 Conn. App. 555, 559, 760 A.2d 532 (2000). The court also balanced M's intrinsic need for stability and permanency against the remote potential benefit of maintaining a connection with the respondent, her biological mother. See *Pamela B.* v. *Ment*, 244 Conn. 296, 313–16, 709 A.2d 1089 (1998).

"The legal framework for deciding termination petitions is well established. [A] hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights set forth in § 17a-112 . . . exists by clear and convincing evidence. . . . If the trial court determines that a statutory ground for termination exists, then it proceeds to the dispositional phase. During the dispositional phase, the trial court must determine whether termination is in the best interests of the child. . . . The best interest determination also must be supported by clear and convincing evidence." (Citations omitted; internal quotation marks omitted.) *In re Davonta V.*, 285 Conn. 483, 487–88, 940 A.2d 733 (2008).

"Our standard of review on appeal from a termination of parental rights is whether the challenged findings are clearly erroneous. . . . The determinations reached by the trial court that the evidence is clear and convincing will be disturbed only if [any challenged] finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous. . . . On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. . . . A finding is clearly erroneous when

either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . [G]reat weight is given to the judgment of the trial court because of the [trial court's] opportunity to observe the parties and the evidence. . . . [An appellate court does] not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Citation omitted; internal quotation marks omitted.) *In re Katia M.*, 124 Conn. App. 650, 660, 6 A.3d 86, cert. denied, 299 Conn. 920, 10 A.3d 1051 (2010).

"Personal rehabilitation . . . refers to the restoration of a parent to his or her former constructive and useful role as a parent [and] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . The statute does not require [a parent] to prove precisely when she will be able to assume a responsible position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation she has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date she can assume a responsible position in her child's life." (Citations omitted; internal quotation marks omitted.) *In re Eden F.*, 250 Conn. 674, 706, 741 A.2d 873, reargument denied, 251 Conn. 924, 742 A.2d 364 (1999).

On the basis of our review of the record and the court's thorough and well reasoned memorandum of decision, we conclude that the court's findings were not clearly erroneous. The unfortunate facts of this case make clear that the respondent, due to her serious and

long-standing mental illness, has not been able to achieve the degree of rehabilitation that would encourage the belief that she could assume a responsible position in M's life within a reasonable time, considering the child's age and needs. The facts here present a clear example of a case in which termination of parental rights is appropriate. Moreover, the court's finding that it was in M's best interest to terminate the respondent's parental rights is not clearly erroneous.

The judgment is affirmed.

In this opinion the other judges concurred.