# IN RE GIANNI C. ET AL.*
## (AC 32259)

Beach, Bear and Flynn, Js.

Argued March 7—officially released May 31, 2011

Orland, 5 Connecticut Practice Series: Criminal Jury Instructions (4th Ed. 2007) § 6-3, p. 503.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

*Thomas F. Mitola,* for the appellant (respondent mother).

*Renee Bevacqua Bollier,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* former attorney general, and *Susan T. Pearlman,* assistant attorney general, for the appellee (petitioner).

*Howard J. Wicker,* for the minor children.

*Opinion*

FLYNN, J. The respondent mother, Carmen C.,[1] appeals from the judgments of the trial court terminating her parental rights as to her minor children, Gianni C. and Jada G. On appeal, the respondent claims that the court improperly determined that she had failed to achieve a sufficient degree of personal rehabilitation pursuant to General Statutes § 17a-112 (j) (3) (B) (i). The respondent argues that the evidence in the record does not support the court's determinations. We disagree and, therefore, affirm the judgments of the trial court.

---

[1] The trial court, in addition to terminating the parental rights of the respondent mother as to her minor children, Gianni C. and Jada G., also terminated the parental rights of the children's fathers. Because neither father has appealed, we refer in this opinion to the respondent mother as the respondent.

The record reveals the following facts and procedural history. This matter came to the attention of the department of children and families (department) on December 9, 2006, after the respondent was arrested for participating in the armed robbery of a CVS pharmacy. The police notified the department, and the petitioner, the commissioner of children and families, invoked a ninety-six hour hold; see General Statutes § 17a-101g; on both children and, subsequently, the court entered an order of temporary custody in favor of the petitioner. On February 15, 2007, the court adjudicated the children uncared for and committed them to the custody of the petitioner. The court approved a permanency plan of adoption on December 12, 2007. Following a criminal trial, in September, 2007, the respondent was convicted of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4) and sentenced to nine years imprisonment, execution suspected after five years to serve, and three years probation, with a maximum release date in 2011. Following her arrest, the respondent was incarcerated from December, 2006, through February 17, 2010, at which point the respondent was released to a halfway house.

On February 11, 2008, the petitioner filed a petition pursuant to § 17a-112 to terminate the parental rights of the respondent and the father, Gabriel A., as to Gianni, on the grounds of abandonment (father), failure to rehabilitate (mother), and no ongoing parent-child relationship (father). On that same date, the petitioner also filed a petition to terminate the parental rights of the respondent and the father, Luis G., as to Jada, on the grounds of failure to rehabilitate (father and mother), and no ongoing parent-child relationship (father and mother). On April 9, 2010, the court found, by clear and convincing evidence, that the respondent had failed to achieve a sufficient degree of rehabilitation as would encourage the belief that within a reasonable

time, considering the ages and needs of the children, she could assume a responsible position in the life of her children. The court terminated the parental rights of the respondent after finding that doing so was in the best interest of both Gianni and Jada. This appeal followed.

Section 17a-112 (j) provides in relevant part: "The Superior Court . . . may grant a petition filed [for termination of parental rights] if it finds by clear and convincing evidence that (1) the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent . . . (2) termination is in the best interest of the child, and (3) . . . (B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent . . . and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights [under § 17a-112 (j)] exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase." (Internal quotation marks omitted.) *In re Sole S.*, 119 Conn. App. 187, 190–91, 986 A.2d 351 (2010). In the dispositional phase, "the emphasis appropriately shifts from the conduct of the parent to the best interest of the child." *In re Romance M.*, 229 Conn. 345, 356–57, 641 A.2d 378 (1994). The best interest determination also must be supported

by clear and convincing evidence. *In re Mia M.*, 127 Conn. App. 363, 375, 14 A.3d 1024 (2011).

"Our standard of review on appeal from a termination of parental rights is limited to whether the challenged findings are clearly erroneous. . . . A finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . [G]reat weight is given to the judgment of the trial court because of [the trial court's] opportunity to observe the parties and the evidence. . . . [An appellate court does] not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) *In re Sole S.*, supra, 119 Conn. App. 191.

The court found the following relevant facts. Gianni was born on November 2, 2001. Jada was born on October 30, 2004. The respondent has been known to the department since 2004 when Gianni suffered a broken leg while in her care. At that time, the respondent was residing with the father of Jada. The case ultimately was closed after the respondent cooperated with referrals for parenting classes and domestic violence counseling.

The children have had numerous placements since entering the department's care in December, 2006. They were placed in a preadoptive therapeutic foster home that was licensed by Boys and Girls Village. In December, 2008, on the basis of an allegation by Jada that she had been sexually abused by a family member of a foster parent, the children were moved to the Boys and Girls safe haven. Following the removal, Gianni's godmother, Janet Q., increased her contact with the children and visited the children two to three times per

week at the Boys and Girls safe haven, taking them to therapy, and taking them to her home on weekends. Janet Q. had been involved with the children since birth, and she continued to maintain a close connection with them. The children referred to her as either their godmother or sometimes their grandmother. In March, 2009, the department pursued licensure and placement of both children with Janet Q., and the permanency plan for both children became adoption by Janet Q.[2]

In September, 2008, the respondent participated in a court-ordered psychological evaluation with Nancy Randall, a psychologist. The respondent reported to Randall a history characterized by physical abuse by her parents and sexual abuse by her brother and some of her male cousins. She further reported a relationship with Jada's father that involved domestic violence. Additionally, the respondent reported that prior to her incarceration she had been smoking marijuana almost daily since she was fifteen years old to avoid the nightmares that she had about the negative things that had happened in her life. In the evaluation, the respondent also discussed the armed robbery that led to her arrest, conviction and incarceration. The respondent reported that she had tried to disengage herself from the robbery plans but that her brother made her go through with it and her children needed winter coats.

Gianni and Jada also participated in court-ordered psychological evaluations with Randall. Randall reported that the personality testing results of Gianni were consistent with that of a child who had been exposed to incidents of domestic violence and high levels of conflict and anger. During the interactional session with the respondent, Gianni appeared to be

_____

[2] At oral argument, counsel for the minor children represented that the children have been placed with Janet Q. for quite some time, and that the children are satisfied and secure there.

angry with the respondent at times, while at other times he appeared to enjoy the time he spent with her. Randall reported that the interactional session with Jada was a positive one, although Jada quickly walked away from the respondent as soon as the social worker arrived to pick up the children.

Randall concluded at the end of the evaluation that given the length of time that the children already had been out of her care, and their ages, it would not be beneficial for them to wait such a long time to have an opportunity to work toward a significant relationship, because the children were in need of permanency in their lives, to allow them to achieve optimal emotional stability.

On November 12, 2008, Randall testified at trial that her biggest concerns were whether the respondent "could make it on the outside and the length of time" it would take for her to be released from incarceration. Randall was concerned that, based on the respondent's maximum release date, the respondent would have been separated from the children for five years, and, in the interim, that the children were in limbo. Randall also stated that, even if the respondent were released six months from the date of trial testimony, November 12, 2008, it would be too long to make the children wait for permanency. Randall further maintained that the respondent would need a period of time in the community outside the structure of incarceration to determine whether she could make appropriate choices for herself and for her children. Additionally, Randall stated that it was not clear what types of memories Jada had of her mother, as she was just two years old when the respondent was incarcerated. Randall also testified that Gianni is ambivalent about his relationship with his mother.

We now address the respondent's principal claim on appeal, namely, that the court improperly determined

that there was sufficient evidence to find that she had failed to achieve such degree of personal rehabilitation as would encourage the belief that she could assume a responsible position in the life of her children within a reasonable time as § 17a-112 (j) (3) (B) requires.

"Personal rehabilitation refers to the reasonable fore-seeability of the restoration of a parent to his or her former constructive and useful role as a parent, not merely the ability to manage his or her own life. . . . In conducting this inquiry, the trial court must analyze the respondent's rehabilitative status as it relates to the needs of the particular child. . . . The trial court must also determine whether the prospects for rehabilitation can be realized within a reasonable time given the age and needs of the child. . . . [A] trial court's finding that a parent has failed to achieve sufficient rehabilitation will not be overturned unless it is clearly erroneous . . . ." (Citations omitted; internal quotation marks omitted.) *In re Ellis V.*, 120 Conn. App. 523, 529, 992 A.2d 362 (2010). "In making its determination, the court may rely on events occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time." (Internal quotation marks omitted.) *In re Keyashia C.*, 120 Conn. App. 452, 457 n.12, 991 A.2d 1113, cert. denied, 297 Conn. 909, 995 A.2d 637 (2010).

In its memorandum of decision, when addressing the issue of rehabilitation, the court found the following. Since the respondent's incarceration, she had taken advantage of numerous programs aimed at addressing a variety of issues, including her judgment, self-confidence, choices in men and intrapersonal family issues. The court found that the respondent had demonstrated her desire to change her behavior and that she was seen as a role model for other inmates and was very

supportive of others in their mutual quest for rehabilitation. Elizabeth Allen and David DeCostanza, therapists available to the respondent while incarcerated, testified that the respondent had become a different person. While incarcerated, the respondent also earned the praises of various department of correction officers and a captain at the detention facility where she was incarcerated. It is undisputed that the respondent was a model of rehabilitation while incarcerated and did everything that was asked of her, and more.

Although the court recognized the respondent's exemplary performance while incarcerated, it also credited Randall's opinion that she was not surprised that the respondent had excelled in a highly structured environment. Randall opined that once the respondent was released, she would need to work on caring for herself and meeting her own needs, which had been difficult for her to do in the past. Thus, the mere passage of time while in prison was a factor, but it was not the only basis on which the court made its determination that the respondent had not achieved sufficient rehabilitation. The court agreed with Randall's assessment that the respondent would need to demonstrate that she could maintain herself in the community, with or without supports, for a reasonable period of time before attempts at reunification were warranted. In this vein, the court evaluated the respondent's past problems when not in a structured environment. The court noted that in addition to the respondent's difficulty accepting responsibility for her arrest, conviction and incarceration, the respondent also had trouble in the past interacting with her family. In support, the court cited Randall's September, 2008 report stating that the respondent acknowledged that there had been times when her family took advantage of her and caused problems in her life. The report indicated that the respondent had difficultly interacting with her family,

standing up for herself and saying "no" when it was needed. The report also stated that the respondent told Randall that the robbery was her brother's idea and that he talked her into it. The court found that in the past, the respondent had allowed herself to become the periodic caretaker of numerous children of her family members, she had tolerated her family's having driven her husband away, and she had allowed her own children's needs to suffer because of her feelings of needing to take care of everyone else.

The respondent's difficulties in the past were not the only factor the court used to make its determination that she had failed to achieve sufficient rehabilitation under § 17a-117 (c) (3) (B) (i). In contemplating the prospects for rehabilitation within a reasonable time, the court considered that the respondent would need time to demonstrate that she could maintain herself in the community, with or without supports, for a reasonable period of time before attempts at reunification were warranted. The court determined that the respondent would need at least one year to reintegrate back into the community and demonstrate that she could function appropriately, with or without supports. When the respondent was asked what her plans were upon release, she stated that she planned to continue with therapy, obtain employment, secure adequate housing and go back to school.[3] The court acknowledged that the respondent's overall goal was to reunite with her children, and noted that she recognized that she must first obtain and maintain these objectives before she could be reunited with her children. As of the last date of trial, however, it was unclear when the respondent would be able to start working toward actively achieving these objectives. As of the last date of trial, the

---

[3] Despite stating these objectives, it was uncertain how she would achieve them. When the respondent testified on this issue in March, 2010, she stated that she had not yet decided what she was going to do, but was going to consider her options.

respondent had not yet been granted parole. If and when parole were granted, only then would she be free to pursue her goal of reunification. The court found that if she were not paroled, however, she would not be discharged from department of correction custody until December, 2010, her maximum release date. The court found that the passage of time and the uncertainty of how the respondent would do when she was not in a structured environment did not encourage a reasonable belief that the respondent could assume a responsible position in the lives of the children, either at the present time or in the foreseeable future.

We acknowledge that the respondent made great efforts and made certain progress while incarcerated. Rehabilitation, however, cannot be viewed in a vacuum. Section 17a-117 (c) (3) (B) (i) required the court to look at the respondent's rehabilitative status as it related to the needs of both children. In this step of the process, the court made certain findings regarding the best interests of the children. The court noted that Gianni had just become five years old and Jada had just become two years old when their mother was incarcerated in December, 2006. At the time of the trial court's decision in the present case, Gianni was eight and Jada was five. Thus, Gianni and Jada had been out of the respondent's care since ages five and two, respectively. During this period, the children had endured multiple placements. They had been in a number of foster home placements, including one removal based on allegations made by Jada of sexual abuse, and both children have specialized needs. The court found that this uncertainty was detrimental to the well-being of the children. The court noted that during this period, Gianni exhibited defiant behaviors, enuresis and stealing, and was receiving counseling to address his anxiety and adjustment disorders.[4]

---

[4] Randall, in her 2008 report, reported that the personality testing results of Gianni were consistent with that of a child who had been exposed to incidents of domestic violence and high levels of conflict and anger in

The court also noted that Jada was receiving services from a Birth to Three program due to her apparent lack of stimulation. In light of these facts, the court properly gave considerable weight to the minor children's pressing need for permanence and stability. Although the court acknowledged that the respondent had made tremendous strides, given what the children had endured for the last three plus years, the court found that to allow the respondent additional time to rehabilitate or to connect with the children would further delay permanency. The court concluded that every additional day of delay in permanency would not be in the best interests of these children.[5] The court had to make a judgment whether the respondent was likely to rehabilitate and to reunify with the children in a reasonable time period, and, on the basis of the record before it, the court was not able to reach that conclusion.

The court had the opportunity to observe the parties and the evidence and make credibility determinations. We cannot reweigh the evidence or resolve questions of credibility in making such a determination. *State* v. *Melillo*, 17 Conn. App. 114, 117, 550 A.2d 319 (1988). On the basis of the testimony of all the witnesses and a review of all the evidence, the court did not believe that the respondent could assume a responsible position in the lives of the children. The respondent has

that he is more likely to view anger and aggression as normal aspects of interpersonal relationships. Randall also noted that Jada's relationship with her mother is a visiting one and does not rise to the level of a psychological parent.

[5] The court agreed with Randall's conclusion that termination would not be in the children's best interests only if the respondent's release from incarceration was imminent, and it was not. "In her January, 2009 update, Randall credited [the respondent] with great strides made while incarcerated and even recommended that termination proceedings be delayed or that the [termination of parental rights] petition be withdrawn 'if the [respondent's] release from prison was imminent' . . . . However, in the absence of such an imminent release . . . Randall continued to opine that, given the length of time the children had already been in care, termination of parental rights continued to be in their best interests . . . ." (Citations omitted.)

not shown that the court's findings were clearly erroneous in the difficult decision it had to make. In its thorough and thoughtful decision, the court found by clear and convincing evidence that the children's best interests would be served by granting the petitions to terminate the respondent's parental rights.

The judgments are affirmed.

In this opinion the other judges concurred.