******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

APPENDIX

IN RE EMILY S.*

Superior Court, Judicial District of
New Britain, Juvenile Matters
File No. CP-18-012507-A

Memorandum filed April 22, 2021

*Proceedings*

Memorandum of decision on petition by Commissioner of Children and Families to terminate respondent's parental rights with respect to his minor child and on motion for review of permanency plan. *Judgment terminating respondent's parental rights and approving permanency plan.*

*Jeanette Johnson*, assistant attorney general, for the petitioner.

*Chris Oakley*, for the respondent.

*Patricia Lyga*, for the minor child.

*Opinion*

HUDDLESTON, J.

<u>MEMORANDUM OF DECISION</u>

Emily S. is a young child, born on August 5, 2018. Now pending before the court are an amended coterminous petition for the termination of parental rights as to the child's father, Damon F., and a contested motion for review of a permanency plan. The child was previously adjudicated neglected, and the parental rights of the child's mother were terminated by consent, on July 23, 2019. The child's mother died on November 4, 2019.

A consolidated trial as to all issues relating to Mr. F. was held on February 8, 2021. Mr. F. appeared and was represented by counsel. The child was also represented by counsel.

The court finds that it has jurisdiction over the matter. Proper notice of the proceeding was provided. No action is pending in any other court concerning the custody of this child. No Native American tribal affiliation was claimed, and the Indian Child Welfare Act does not apply.

For all the reasons that will be discussed in this decision, the court finds that the department has proved, by clear and convincing evidence, that a statutory ground for termination exists and that termination is in the child's best interest. The petition is granted and the Commissioner [of Children and Families] is appointed the child's statutory parent. Mr. F.'s objection to the permanency plan is overruled, and the permanency plan is approved as in the best interest of the child.

I

RELEVANT PROCEDURAL HISTORY

Emily was born on August 5, 2018. At her birth, both the child and her mother, Florence M., tested positive for opiates and cocaine. Ms. M. left the hospital against medical advice on the day of the child's birth and did not provide any information concerning the child's father. On August 15, 2018, the Commissioner of the Department of Children and Families (department or DCF) initiated a ninety-six hour hold. On August 16, 2018, the department filed an ex parte motion for order of temporary custody and coterminous neglect and termination of parental rights petitions. The pleadings named Ms. M. as the respondent mother and John Doe as the respondent father. Ms. M. was served by abode service. Publication was ordered as to John Doe.

The ex parte motion for order of temporary custody was granted on August 16, 2018, and sustained by default on August 24, 2018, at the preliminary hearing on the order of temporary custody. At that hearing, the department's counsel orally moved to cite in John S.

as the child's putative father, based on information recently provided to the department by Ms. M. That motion was granted. On the plea date of September 12, 2018, Mr. S. appeared, was advised of his rights, and entered pro forma denials. Putative father John Doe was defaulted for failure to appear. The department sought and obtained an order for paternity testing as to Mr. S. On November 13, 2018, the department filed a DNA report which indicated that Mr. S. was excluded as the child's father. The department moved for a judgment of nonpaternity as to Mr. S., which was granted, and Mr. S. was removed from the case.

Also on November 13, 2018, the mother appeared, was appointed counsel, and the previous default was vacated. She was questioned under oath as to possible fathers and was reminded that she had mentioned Mr. F. as a possible father. She responded that he was not the father and she did not know who the father might be. She said it could have been a man in Bristol. The court ordered service of notice by publication in Bristol for John Doe, which was effected. Doe was defaulted when he did not appear on the plea date of December 6, 2018.

While the case was pending, the department requested and obtained a study under the Interstate Compact on the Placement of Children (ICPC), General Statutes § 17a-175, regarding the possible placement of the child with a maternal uncle and his family in Missouri. The ICPC study was completed and the maternal uncle was initially approved for placement. When the child was classified as a medically complex child, however, additional approval was needed from Missouri. After coming to Connecticut on two occasions to meet the child, her foster mother, the social worker, and the child's medical providers, the maternal uncle ultimately withdrew from ICPC consideration because he did not want to disrupt the child's current placement. He has maintained regular contact with the foster mother up to the present time.

On July 23, 2019, Ms. M. appeared for a coterminous trial on the neglect and termination petitions. She entered a nolo contendere plea to the neglect petition and tendered her consent to the termination petition. John Doe had previously been defaulted for failure to appear at the initial plea hearing and was not present for the trial. After DCF presented its evidence, the court, *Lobo, J.*, adjudicated the child neglected on the ground that she had been denied proper care and attention. The court then terminated the parental rights of Ms. M. and of John Doe. At the request of the assistant attorney general representing the department, the court postponed the disposition on the termination petition to allow the department additional time to speak with an additional putative father, Mr. F. The department's counsel explained that an anonymous caller had con-

tacted the department's Care Line on July 7, 2019, and provided information about a possible father of the child. The social worker had been able to locate the putative father out of state but had not yet succeeded in making contact with him. Although Ms. M. again denied that Mr. F. could be the father, the court postponed the disposition on the termination petition. The court entered a disposition on the neglect petition, committing the child to the custody of the department.

At an in court review on August 21, 2019, the department's social worker reported that she had communicated with Mr. F. on July 26, 2019. At that time, Mr. F. was incarcerated in Strafford County Corrections in Dover, New Hampshire. Mr. F. told the social worker that he did not believe he was the child's father and he did not wish to have a paternity test. The court, *Lobo, J.*, ordered the department to amend the petition to include Mr. F. as a putative father and to effectuate service. The social worker spoke with Mr. F. again in August, 2019, approximately a month after her first conversation with him, and in that conversation he told her that he might be the child's father and would be willing to participate in a paternity test.

On September 12, 2019, the department filed amended coterminous petitions for neglect and termination of parental rights, naming Mr. F. as the respondent father. On the plea date, October 9, 2019, Mr. F. appeared by telephone, was advised of his rights, and confirmed that he had received the petitions. He declined to apply for appointment of counsel at that time. The department orally moved for paternity testing, which the court ordered. The paternity test subsequently indicated a 99.99 percent probability that Mr. F. is the child's father. A finding of paternity was made on October 28, 2019. Mr. F. applied for counsel, and counsel was appointed.

Although the neglect petition was amended to name Mr. F. as the sole respondent, neither the neglect adjudication nor the disposition of commitment was opened or modified as a result of the amendment.[1] The amended petition for termination of parental rights, naming Mr. F. as the sole respondent, alleged abandonment and the absence of an ongoing parent-child relationship as the statutory grounds for termination. At a hearing on March 5, 2020, the court ordered specific steps for Mr. F. and reviewed those steps with him. Trial on the termination of parental rights petition was scheduled for March 23, 2020, but was subsequently postponed as a result of the Covid-19 pandemic. On April 6, 2020, the department filed a motion for review of the permanency plan, which proposed a plan of termination of parental rights and adoption. Mr. F., through counsel, filed an objection to the proposed plan, and the contested hearing on the permanency plan was consolidated with the trial on the termination petition.

The consolidated trial on the termination petition and the permanency plan took place on February 8, 2021, as a virtual trial on the Microsoft Teams platform. Mr. F., who remains incarcerated in New Hampshire, appeared by video and was represented by counsel. The court advised Mr. F. of his rights and of the nature of the termination proceeding as required by *In re Yasiel R.*, 317 Conn. 773, 794, 120 A.3d 1188 (2015). The department had previously filed two motions for judicial notice: one for judicial notice of the court record, and a second for judicial notice of copies of ten judicial records, nine of which related to a prosecution pending against Mr. F. in the United States District Court for the District of Maine, and one of which was a copy of a Connecticut Supreme Court decision affirming a prior Connecticut conviction of Mr. F. The motions for judicial notice were granted without objection or limitation.

The department presented the testimony of Courtney E., the foster mother in whose care the child has been placed since her discharge from the hospital after birth, and Margaret DeSena, the department social worker who was assigned to the case.

The department proffered twelve exhibits, some of which were redacted by agreement. The exhibits were admitted in full without objection. The department's exhibits included the following:

- State's Exhibit 1: Social Study in Support of Neglect and Termination of Parental Rights Petition dated September 12, 2018, as redacted

- State's Exhibit 2: Status Report dated May 1, 2019

- State's Exhibit 3: Addendum to the Social Study dated October 8, 2019

- State's Exhibit 4: Status Report dated January 23, 2020, as redacted

- State's Exhibit 5: Motion to Review Permanency Plan and Study in Support Thereof dated March 9, 2020

- State's Exhibit 6: Addendum to the Coterminous Social Study dated February 1, 2021

- State's Exhibit 7: Criminal Conviction Certification record dated February 6, 2020

- State's Exhibit 8: Department of Correction Records dated February 3, 2020

- State's Exhibit 9: Yale-New Haven Health L & M Rehabilitation Services Physical Therapy Summary dated January 3, 2020, as redacted

- State's Exhibit 10: Letter by Amanda Vellali, M.S., CCC-SLP, Pediatric Speech Pathologist dated February 11, 2020, as redacted

- State's Exhibit 11: ProHealth Physician's Letter by

Allyson Salek, M.D., dated February 17, 2020, as redacted

• State's Exhibit 12: LEARN Birth-to-Three Letter by Allison Frost, M.S., Special Ed/Early Intervention Specialist, as redacted

After the department rested, Mr. F.'s counsel moved for judgment as a matter of law, arguing that the department had failed to meet its burden of proof with respect to the ground of abandonment. The court reserved decision on that motion.

Mr. F. then testified after being canvassed by his counsel about his decision to testify. In addition, Mr. F. introduced one exhibit, Respondent's Exhibit B, Father's Specific Steps as ordered on March 5, 2020. That exhibit was admitted in full without objection.

The court heard arguments of counsel at the close of the evidence. Among other arguments, counsel for the department and counsel for the minor child argued that Mr. F. has no relationship with the child, no understanding of the degree and intensity of care the child needs, and that it would be highly detrimental to the child to disrupt her secure placement. Counsel for Mr. F. argued against termination. He emphasized the fundamental constitutional interests at stake for the father and Mr. F.'s desire to parent his child or to have her placed with his family. He argued that the fact of incarceration can never constitute abandonment, and further argued in favor of allowing Mr. F. additional time to establish a parent-child relationship.

The court has carefully considered all the testimonial and documentary evidence in light of the applicable statutes and principles of law. It has considered the demeanor and credibility of the witnesses. It has taken judicial notice of court records as permitted by law. It has considered the arguments of counsel.

## II

## PRELIMINARY FACTS

### A

### The Child

Emily was born on August 5, 2018, at the Hospital of Central Connecticut in New Britain. She was premature, weighing approximately four pounds, but her true gestational age was unknown because her mother, Ms. M., received no prenatal care during her pregnancy. Ms. M. had a significant history of substance abuse. Her substance abuse had led to the termination of her parental rights as to her older child, Jadalynn, who was born in 2008. Ms. M. provided no information about Emily's father to hospital staff. She left the hospital against medical advice on the day of Emily's birth and did not return to visit her.

Emily tested positive for cocaine and opiates at birth

and was kept in the neonatal intensive care unit (NICU) for ten days. She experienced withdrawal symptoms, which required her to be given morphine. While Emily was in the hospital, the department identified a legal risk licensed preadoptive home. The identified foster mother visited Emily daily while she was in the NICU and learned about the care she would need upon discharge. On August 15, 2018, the department initiated a ninety-six hour hold, and, on the next day, sought and obtained an ex parte order of temporary custody. Emily was discharged from the hospital and placed in the preadoptive home, where she has remained through the date of the trial.

Emily has had substantial medical and developmental issues. She has been diagnosed with neonatal abstinence syndrome. In the first months after her discharge from the hospital, she had severe tremors, cried constantly, and seldom slept. She had severe gastrointestinal issues, including reflux throughout her first year of life. She had difficulty having bowel movements. She lost weight at first, and her weight had to be checked twice weekly at the pediatrician's office or by a visiting nurse. She was on a prescription formula for her first two years.

In her first months of life, Emily lacked the ability to suck and had to be wakened every two hours for feeding. She was referred to a feeding team for therapy to help strengthen the muscles in her mouth and tongue. Although she had made substantial progress with feeding by the age of two and one-half, and, although she is now able to speak, she will continue to need speech therapy to address a lisp and a stutter.

Emily also developed significant respiratory issues that led to multiple visits to the emergency room. When she was four months old, she was referred to a pulmonologist. She had to be given breathing treatments, each taking about forty-five minutes, three or four times daily. On November 25, 2018, she was diagnosed with pneumonia in an emergency room visit and was given a stronger breathing treatment. Her respiratory issues have continued. She has been diagnosed with severe persistent asthma, which is managed through administration of an inhaled steroid once or twice a day. A dual treatment plan is in place when she develops congestion, because she gets sick very quickly. She is seen by a pulmonologist every four months. Her physician has stated that she is likely to have pulmonary issues throughout her life. As a result of her respiratory issues, she has been classified as a child with complex medical needs, Level 3.[2]

At the age of eighteen months, Emily was tested for Hepatitis C and was found to be positive. She will need to have blood tests every eight months to monitor the effects of the Hepatitis C infection on her liver. She is monitored by the gastroenterology department at the

Connecticut Children's Medical Center for this condition. Her medical providers hope to delay treatment for the condition until she is at least five years old because the treatments are harsh for children. Because of the Hepatitis C infection, she cannot take certain medications that can harm the liver, and care must be taken to ensure that all of her medical providers are aware of the condition.

Emily was developmentally delayed in both gross and fine motor skills. She has required physical therapy and occupational therapy to address those delays. She had tightness on her left side, and there was a question as to whether she might have cerebral palsy. She has had vestibular issues which are very frustrating for her. She received Birth to Three services from October, 2018, through November, 2020, when she was successfully discharged.

Emily is currently in day care full time, although her foster mother has sometimes kept her home during the pandemic. Emily is in a therapeutic room in her day care setting. Her teacher is a certified therapeutic teacher. The therapeutic room in the day care provides a smaller class with more direct one-on-one attention. The staff is trained to administer Emily's breathing treatment during the day.

Emily has a hard time adapting to strangers and looks to her foster mother as her source of security. Emily received Birth to Three services at the day care because her providers thought it was beneficial to see her interact with other children. Emily's foster mother communicated with the Birth to Three providers regularly to get reports on what they had done and to share what she was noticing about Emily's development.

Although Emily was successfully discharged from Birth to Three services, she continues to need physical and occupational therapy for various issues. She is delayed in developing fine motor skills and still cannot use a fork or spoon. The delay in fine motor skills affects her eating and causes her frustration in playing with toys such as Megablox.

Emily's providers attribute much of Emily's medical and physical progress to the consistent care and attention of her foster mother, who has attended every medical appointment with her and has carefully attended to the various breathing and other medical treatments and physical therapy exercises that have been prescribed for Emily at home. The foster mother's six year old son has also participated in Emily's physical therapy, motivating her to copy his actions.

Emily's pediatrician has indicated that, as a result of her prenatal exposure to drugs, Emily is expected to have learning disabilities and will have an "uphill battle" when she starts school. She will likely require special education services.

## B

### The Father

Mr. F. was born in February, 1975, in Hartford, Connecticut, in a household with his mother, his sister, and his grandmother. He also has two paternal half-siblings. He told the department that he continues to have a relationship with his mother and all his siblings, who provide financial and emotional support for him. He denied any traumas during his childhood and reported that he did well in school, although he admitted to behavioral issues in school, where he was often in trouble. When he was seventeen, in 1992, he was arrested, and subsequently convicted, on charges of robbery in the first degree, for which he received a five year sentence. He obtained his GED while incarcerated.

Mr. F. has never been married, but he has one older child, Daijah, who is now an adult. The department's records indicate that Mr. F. was substantiated for physical neglect with regard to Daijah in 2003. The social worker testified that Mr. F. had a history of domestic violence and harassment with Daijah's mother and was convicted of violating a protective order for which Daijah's mother was the protected person. That testimony was corroborated by a copy of a 2006 decision by the Connecticut Supreme Court, which affirmed Mr. F.'s conviction arising from a 2003 incident relating to his child's mother.

Mr. F. has been incarcerated for most of his adult life, with relatively brief periods of liberty followed by new arrests, convictions, and further incarceration. More specifically: Mr. F.'s Connecticut criminal conviction history indicates that, between 1992 and 2012, he was convicted on the following dates on the stated Connecticut charges: (1) December 12, 1992, larceny in the sixth degree; (2) April 23, 1993, robbery in the first degree and conspiracy to commit robbery in the first degree; (3) November 12, 1997, sale of narcotics; (4) May 12, 1999, carrying a pistol without a permit and possession of narcotics; (5) February 14, 2003, disorderly conduct; (6) August 5, 2004, running from police; (7) August 5, 2004, violation of a protective order; and (8) October 18, 2012, violation of a protective order. During those years, he was also convicted of violations of probation in 1999, 2004, and 2012. He spent approximately nineteen of the twenty-three years between 1992 and 2015 in correctional facilities. During some of his periods in the community, he was on probation, parole, or special parole. His criminal history in Connecticut, so far as the record discloses, ended when he was discharged from a period of special parole in April, 2016.

When he was not incarcerated, Mr. F. worked at various jobs. He was most recently employed in 2017, at Boost Mobile, where he worked for eighteen months. Before that, he worked at Hartford Hospital in environ-

mental services for seven months. He has also worked as a truck driver in the past.

Mr. F.'s Connecticut criminal history and incarceration records end in 2016, but his criminal activity did not end then. Although the department did not introduce a copy of Mr. F.'s criminal conviction history from other states, both the social worker and Mr. F. testified that, when the social worker first spoke with Mr. F. on July 26, 2019, he was incarcerated at Strafford County Correctional facility in Dover, New Hampshire, where he was serving a sentence on state criminal charges from the state of Maine and was also under an order of detention for a pending federal criminal charge. The social worker testified that she believed that Mr. F.'s incarceration began on or about February 19, 2019, and Mr. F. did not offer contradictory testimony.

Evidence as to Mr. F.'s incarceration status as of the date of trial is found in the testimony of both the social worker and Mr. F. and in nine documents related to the criminal charge pending against Mr. F. in federal District Court in Maine. These documents were attached to a motion for judicial notice filed on February 7, 2021, which was granted without objection and without limitation. The documents include an arrest warrant issued on January 20, 2019; the criminal complaint dated January 30, 2019; an indictment synopsis dated June 20, 2019; an order of detention pending trial issued on May 30, 2019; an excerpt from a transcript of a hearing held on February 6 and February 11, 2020, on Mr. F.'s motion to suppress certain evidence in the District Court action; a speedy trial order dated April 30, 2020; a decision on [Mr. F.'s] renewed motion for an expedited and combined plea and sentencing hearing by telephone or videoconference, dated June 2, 2020; a decision on [Mr. F.'s] second renewed motion for an expedited and combined plea and sentencing hearing by videoconference, dated August 24, 2020; and a speedy trial order dated December 11, 2020.

The information that can be gleaned from the federal District Court documents is as follows: The government alleges that, on January 6, 2019, Mr. F. knowingly and intentionally possessed heroin with intent to distribute it in violation of 21 U.S.C. § 841 (a) (1) (2018). His arrest resulted from a traffic stop in Maine on that date. On the date of the traffic stop, he was out on bond on various Maine state charges. His motion to suppress certain evidence obtained as a result of the traffic stop was denied. He subsequently moved for an expedited and combined plea and sentencing hearing by telephone or videoconference so that he could enter a conditional guilty plea, be sentenced, and then appeal the denial of his motion to suppress. The District Court denied the motion on June 2, 2020, but on August 24, 2020, the District Court granted Mr. F.'s second renewed motion for such a remote hearing. As of the date of trial in this

case, the federal plea and sentencing hearing had not yet been scheduled. On at least two occasions, the District Court had issued, on its motion, "speedy trial orders," in which the court excluded certain dates from the calculations under the Speedy Trial Act, attributing the exclusion to the public health crisis caused by the Covid-19 pandemic. The more recent of those orders, dated December 11, 2020, excluded the time between February 1, 2021, and April 5, 2021, from calculations under the Speedy Trial Act.

Mr. F. testified at trial that he hopes to have his federal court sentencing hearing in April, 2021, and he hopes to receive a sentence of time served. He testified that his sentencing range under the Federal Sentencing Guidelines is "thirty or thirty-one months" and he has served "about twenty-one" months. His testimony is not entirely consistent with the federal court documents. In a ruling dated June 2, 2020, the federal district judge observed that, according to a preplea presentence report authorized by the court, Mr. F.'s Guideline range is thirty to thirty-seven months, but the judge noted that Mr. F.'s own motion stated that the Guideline range might be increased to thirty-three to forty-one months when additional information about his criminal history was considered. The District Court further commented that Mr. F. would not begin to be detained on the federal charge until he completed his sentence on the state charge, an event which was imminent at the time of the District Court's ruling on June 2, 2020. If the District Court's summary is accurate, Mr. F. had served approximately eight months in federal detention by February 8, 2021, the date of the trial in this court, and he may face a Guideline sentence range of as much as forty-one months. If Mr. F.'s testimony was accurate, he was hoping for time served but was exposed to the possibility of eight more months of incarceration. At the time of the trial in this court, it was unknown when his plea and sentencing would be scheduled and what his sentence would be.

There is no evidence in the record as to the exact date when Mr. F. moved from Connecticut to Maine, but it can be inferred to have been at some time between 2016, when he was discharged from special parole in Connecticut, and 2018, when he had a relationship with Florence M., the mother of the child at issue in this case.

The social worker initially spoke with Mr. F. on July 26, 2019. He told the social worker that Ms. M. was with him for "a time" in Maine and that he loved her but could not stay in a relationship with her because she was using heroin and cocaine. (Ex. 3, p. 3.) He made inconsistent statements about whether he knew about Ms. M.'s pregnancy and his potential paternity. In his first conversation with the social worker, he stated that he was aware that Ms. M. had a baby but he did not believe the child was his. At other times he

stated that he was unaware that Ms. M. was pregnant or had his child. He admitted that he had not taken phone calls from Ms. M. after their breakup because he was upset with her, but he also said that he had spoken with her in July, 2018, and she did not tell him she was pregnant. He initially did not want to participate in a paternity test. When the social worker contacted him again a month after their first conversation, however, he said that he might be the father and agreed to a paternity test. He did not want to provide any resources for the child until the paternity test was completed. A DNA test was ordered, and the results received in October, 2019, confirmed Mr. F.'s paternity.

In November, 2019, after his paternity was determined, Mr. F. offered Tabitha Hand as a placement resource. Ms. Hand lived in Madawaska, Maine. On December 12, 2019, Mr. F.'s counsel filed a motion for an order for an expedited ICPC study of Ms. Hand as fictive kin. In the motion, he represented that Ms. Hand lived in the town where Mr. F. planned to live when his prison sentence was concluded and that she was a licensed foster parent in Maine. The social worker spoke with Ms. Hand and began the process of collecting information to assess her suitability. In speaking with Ms. Hand, the social worker learned that Ms. Hand was the mother of a friend of Mr. F. and had only met Mr. F. on a few occasions. The department concluded that Ms. Hand did not qualify as fictive kin because she had never met the child. It also determined that an expedited ICPC study could not be requested because Ms. Hand did not have a biological relationship with the child. Mr. F. did not agree with the department's decision not to consider Ms. Hand and stated that he did not think it would be harmful to the child to change her placement since she was so young. When the social worker attempted to explain the impact of removals at any age, Mr. F. became upset and ended the telephone call. He nevertheless subsequently withdrew his motion for an ICPC study for Ms. Hand.

Mr. F. also proposed his first cousin, Joshua [H.], as a placement resource. Mr. [H.] is employed as a firefighter in Hartford and also runs an electric business. The department assessed Mr. [H.] as a possible placement resource for Emily. The social worker spoke with him and then met with him with the foster mother, who described the child and provided a summary of her medical conditions and needs. Mr. [H.] and his mother subsequently met with the foster mother and the child for a two hour visit at the foster mother's home, where the foster mother took photographs of the child with Mr. [H.] and his mother. After meeting with the child and the foster mother, Mr. [H.] did not wish to remove the child from her foster home and no longer wished to be considered a placement option. The foster mother, with the department's approval, offered to meet Mr. [H.] in Hartford to take the child to meet Mr. F.'s mother,

but Mr. [H.] never responded to that offer.

Mr. F. has not proposed other family members as possible resources for the child. His mother is elderly and unable to care for the child.

Mr. F. was provided with specific steps which required, among other things, that he engage in substance abuse treatment and a mental health assessment and treatment at the correctional facility. He did not do so even when such services were available; he told the social worker he did not think he needed the services. Since the onset of the pandemic, such services by outside providers have been suspended and have not been available to him. The social worker has called Mr. F. on a monthly basis to discuss the child with him. The social worker has not always been able to reach him, in part because he has a job in the correctional facility's laundry and telephone calls have to be scheduled around his work hours. He has participated in telephone calls when the social worker was able to reach him, and more recently the corrections officer who is his supervisor in the laundry provided an e-mail address the social worker could use to send photographs of the child for him.

Mr. F. has expressed concern for the child and a desire to be able to parent her or to have her placed with his family. Although he has regularly asked about her, he has never sent her a letter or card. The social worker told him that the foster mother was making a memory book for the child about her biological family, including photos of the child's maternal uncle and his family and photos of Mr. [H.'s] visit with the child, but Mr. F. never provided anything to the social worker to be included. He told the social worker that it would be difficult for him to write to the child because he would not know what to say. Mr. F. has never met the child. Although he inquired about visits with her, the department did not provide visits.

Mr. F. acknowledged that the foster mother has taken good care of the child. He admitted that the date of his release from prison is unknown, although he hopes that it will be soon. He further admitted that when he is released from prison, he will need to find housing and employment and will have to engage in services recommended by the department. He nevertheless asks the court to deny the petition to allow him time to be able to care for the child himself or to have her placed with his family.

III

THE PETITION FOR TERMINATION OF
PARENTAL RIGHTS

The court is mindful of what is at stake in a proceeding to terminate parental rights. "[T]he termination of parental rights is defined . . . as the complete severance by court order of the legal relationship, with all

its rights and responsibilities, between the child and his parent . . . . It is, accordingly, a most serious and sensitive judicial action. . . . Although the severance of the parent-child relationship may be required under some circumstances, the United States Supreme Court has repeatedly held that the interest of parents in their children is a fundamental constitutional right that undeniably warrants deference and, absent a powerful countervailing interest, protection." (Internal quotation marks omitted.) *In re Tresin J.*, 334 Conn. 314, 324–25, 222 A.3d 83 (2019). With due consideration for the serious nature of this action, the court has carefully considered the petition, all of the evidence presented, the information in the court files judicially noticed in accordance with the standards required by law, and the arguments of the parties.

"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights [under General Statutes § 17a-112 (j)] exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. . . . In the dispositional phase, the emphasis appropriately shifts from the conduct of the parent to the best interest of the child." (Citation omitted; internal quotation marks omitted.) *In re Gianni C.*, 129 Conn. App. 227, 230, 19 A.3d 233 (2011). "The best interest determination also must be supported by clear and convincing evidence." Id., 230–31. Pursuant to Practice Book § 35a-7 (a), "[i]n the adjudicatory phase, the judicial authority is limited to evidence of events preceding the filing of the petition or the latest amendment, except where the judicial authority must consider subsequent events as part of its determination as to the existence of a ground for termination of parental rights."

In this case, the petition alleges two adjudicatory grounds for termination of Mr. F.'s parental rights: abandonment and the absence of an ongoing parent-child relationship. The elements of these adjudicatory grounds are set out in § 17a-112 (j), which provides in relevant part as follows: "The Superior Court, upon notice and hearing as provided in sections 45a-716 and 45a-717, may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent in accordance with subsection (a) of section 17a-111b, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, except that such finding is not required if the court has determined at a hearing pursuant to section 17a-111b, or determines at trial on the petition, that such efforts are not required, (2) termination is in the best interest of the child, and

(3) (A) the child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child . . . [or] (D) there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child . . . ." That is, in this case, to prove an adjudicatory ground, the department must prove by clear and convincing evidence that it made reasonable efforts to locate Mr. F.; that it made reasonable efforts to reunify Mr. F. with the child or that Mr. F. was unable or unwilling to benefit from reunification efforts; and either that Mr. F. abandoned the child, or that there is no ongoing parent-child relationship, as those grounds are defined in the statute and further explained by judicial decisions. If one or both of those adjudicatory grounds are proved by clear and convincing evidence, the department must also prove, by clear and convincing evidence, that termination is in the best interest of the child.

A

ADJUDICATORY FINDINGS

i

<u>Reasonable Efforts</u>

As stated [previously], in a proceeding on a petition for termination of parental rights under § 17a-112 (j), the court must first determine whether there is clear and convincing evidence that the department made reasonable efforts to locate the parent and to reunify the parent and child, unless the court finds that the parent was unable or unwilling to benefit from reunification efforts. "The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]easonable efforts means doing everything reasonable, not everything possible." (Internal quotation marks omitted.) *In re Jason R.*, 129 Conn. App. 746, 767–68, 23 A.3d 18 (2011), aff'd, 306 Conn. 438, 51 A.3d 334 (2012). "[I]n determining whether the department has made reasonable efforts to reunify a parent and a child or whether there is sufficient evidence that a parent is unable or unwilling to benefit from reunification efforts, the court is required in the adjudicatory phase to make its assessment on the basis of events preceding the date on which the termination petition was filed." *In re Shaiesha O.*, 93 Conn. App. 42, 48, 887 A.2d 415 (2006). Because the amended petition

naming Mr. F. as the respondent father was filed on September 12, 2019, the court must assess the department's efforts on the basis of events before that date.

Clear and convincing evidence establishes that the department made reasonable efforts to locate the child's father under the circumstances that existed before the adjudicatory date. The mother left the hospital on the day of the child's birth without providing any information about the child's paternity. The department had difficulty locating the mother for a time. When the mother did speak with department social workers, she gave inconsistent information about the child's possible paternity, naming, at various times, Mr. S., Mr. F., and a man whose name she did not know who lived in Bristol. Mr. S. believed that he might be the father and agreed to a paternity test, which subsequently excluded him. The mother had not received prenatal care and did not know the child's true gestational age.

The social worker testified credibly that, when Ms. M. first mentioned Mr. F. in October, 2018, Ms. M. mentioned his approximate age and said that he might be in jail in Maine. The social worker conducted online searches for him at that time, but without more information, she was unable to locate him. On July 7, 2019, an anonymous caller informed the department's Care Line that her boyfriend, Mr. F., might be the father of Ms. M.'s child. The caller provided sufficient information about Mr. F.'s date of birth and possible location to allow the social worker, with some "digging," to locate him in New Hampshire after speaking with jails in Maine and in New Hampshire. The social worker spoke to Mr. F. for the first time on July 26, 2019.

In light of the mother's inconsistent statements about the child's possible paternity, her inability to provide accurate information about Mr. F.'s date of birth or his location, the existence of at least one other man who could have been the father, and the uncertainty as to when the child was conceived, the department's efforts to locate Mr. F. were reasonable under the circumstances. The social worker conducted online searches for Mr. F. in October, 2018, but was unable to locate him then. When the mother then identified other putative fathers, the department followed up on those leads. When the department received information that allowed it to conduct a more focused search for Mr. F., the social worker did so promptly, and she soon located him in New Hampshire. She spoke with Mr. F. within three weeks of receiving the information that allowed her to find him.

As to reunification efforts, the termination petition alleges both that the department made reasonable efforts to reunify the father and the child, and in the alternative, that the father was unable or unwilling to benefit from reunification efforts. Either or both of these allegations must be proved by clear and convinc-

ing evidence based on events prior to the adjudicatory date of September 12, 2019.

As of the adjudicatory date, the department had made no efforts to reunify Mr. F. with the child. It had only recently located him and his paternity had not yet been determined. See *In re Shaiesha O.*, supra, 93 Conn. App. 49–50 (where coterminous petition was filed before paternity was established, department failed to make reasonable efforts to reunify parent and child by adjudicatory date).

The court finds, however, that clear and convincing evidence establishes that Mr. F. was unable or unwilling to benefit from reunification efforts as of September 12, 2019. As of that date, Mr. F. was incarcerated in New Hampshire on Maine state criminal charges, for which he still had approximately nine months to serve. He had been ordered detained on pending federal charges when he completed his state sentence, and the outcome of his federal charges was unknown as of the adjudicatory date. The department could not refer him for rehabilitative services in the community, such as drug screening and treatment, mental health issues, and parenting services. Although substance abuse and parenting services might have been available to him through the correctional facility while he was incarcerated, at least initially he did not feel he needed any services. At trial, he acknowledged that he would need to participate in such services when he is released from jail.

"[T]he fact of incarceration, in and of itself, cannot be the basis for a termination of parental rights. . . . At the same time, a court properly may take into consideration the inevitable effects of incarceration on an individual's ability to assume his or her role as a parent. . . . Extended incarceration severely hinders the department's ability to offer services and the parent's ability to make and demonstrate the changes that would enable reunification of the family." (Internal quotation marks omitted.) *In re Tresin J.*, supra, 334 Conn. 325. While imprisonment alone can never constitute abandonment, "[o]n the other hand, the inevitable restraints imposed by incarceration do not in themselves excuse a failure to make use of available though limited resources for contact with a distant child." *In re Juvenile Appeal (Docket No. 10155)*, 187 Conn. 431, 443, 446 A.2d 808 (1982).

Mr. F.'s incarceration in New Hampshire also hindered the department's ability to offer visitation, especially in light of the fact that, as of the date the petition was filed, Emily was a medically complex thirteen month old child with severe respiratory issues that required multiple treatments a day. Nor was telephonic visitation feasible because Emily was not yet verbal. Our courts have recognized that "[t]he logistics of prison visits with young children, particularly to out-

of-state facilities, limit their feasibility." *In re Elvin G.*, 310 Conn. 485, 515, 78 A.3d 797 (2013); see also *In re Luciano B.*, 129 Conn. App. 449, 461, 21 A.3d 858 (2011).

In sum, the court finds, by clear and convincing evidence, that the department made reasonable efforts to locate the father in light of all the circumstances. The court also finds, by clear and convincing evidence, that the father was unable or unwilling to benefit from reunification efforts as of the adjudicatory date and for the foreseeable future.

The court now turns to the adjudicatory grounds alleged in the petition.

ii

Abandonment

The first alleged adjudicatory ground is abandonment. As our courts have often stated, abandonment "occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare. . . . Section 17a-112 [(j) (3) (A)] does not contemplate a sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child. A parent must maintain a reasonable degree of interest in the welfare of his or her child. Maintain implies a continuing, reasonable degree of concern." (Internal quotation marks omitted.) *In re Jermaine S.*, 86 Conn. App. 819, 839–40, 863 A.2d 720, cert. denied, 273 Conn. 938, 875 A.2d 43 (2005).

There is clear and convincing evidence that as of the adjudicatory date, September 12, 2019, Mr. F. had never seen the child, provided financial support, attempted to communicate with the child, shown an interest in the child's welfare, or requested visitation. There is not, however, clear and convincing evidence that Mr. F. *knew* he was the child's father before that date. Ms. M. had moved from Maine to Connecticut before the child's birth. Ms. M. expressed considerable uncertainty about the child's paternity. She told the department on one occasion that Mr. F. might be the father, but on subsequent occasions she denied that he could be the father. At least one other man—Mr. S.—believed that he (Mr. S.) might be the father. Mr. F. himself made contradictory statements to the social worker as to whether he knew that Ms. M. was pregnant or had given birth. Sometimes he said that he had not spoken with her since their relationship ended; sometimes he said he had spoken with her in July, 2018, a few weeks before the child's birth, and she had not told him she was pregnant; sometimes he said that he knew she had a child but did not believe he was the child's father. He admitted she had tried to contact him after they broke up but he had not returned her calls. The fact that a girlfriend of his knew of the child's birth and of his prior relationship with Ms. M. suggests that he *may*

have known more than he admitted, but the evidence is not clear and convincing. Because his paternity was not established until after the adjudicatory date, the court is not persuaded that his conduct before the adjudicatory date can fairly be held to constitute abandonment.

### iii

### Absence of An Ongoing Parent-Child Relationship

The department also alleged, as an adjudicatory ground, that there is no ongoing parent-child relationship between Mr. F. and Emily. Pursuant to § 17a-112 (j) (3) (D), a court may terminate a parent's parental rights if "there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child . . . ."

In *In re Tresin J.*, supra, 334 Conn. 323–33, our Supreme Court provided a comprehensive summary of its prior decisions concerning the adjudicatory ground of no ongoing parent-child relationship and further addressed the application of this ground to an incarcerated parent. It emphasized that this ground must not be used to place " 'insurmountable burden[s]' " on non-custodial parents. Id., 326. It has explicitly rejected a literal interpretation of the statute, holding that day-to-day absence alone is insufficient to support a finding of no ongoing parent-child relationship. Id.

"The lack of an ongoing parent-child relationship is a no fault statutory ground for the termination of parental rights." (Internal quotation marks omitted.) Id., 325. In *In re Tresin J.*, the Supreme Court reiterated that "the ground of no ongoing parent-child relationship for the termination of parental rights contemplates a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitively lost that relationship, so that despite its former existence it has now been completely displaced. . . . *The ultimate question is whether the child has some present memories or feelings for the natural parent that are positive in nature.*" (Emphasis in original; internal quotation marks omitted.) Id.

To determine whether there is " 'no ongoing parent-child relationship,' " the court must engage in a two step process. Id. "In the first step, a petitioner must prove the lack of an ongoing parent-child relationship by clear and convincing evidence. In other words, the petitioner must prove by clear and convincing evidence that the child has no present memories or feelings for the natural parent that are positive in nature. If the

petitioner is unable to prove a lack of an ongoing parent-child relationship by clear and convincing evidence, the petition must be denied, and there is no need to proceed to the second step of the inquiry. If, and only if, the petitioner has proven a lack of an ongoing parent-child relationship does the inquiry proceed to the second step, whereby the petitioner must prove by clear and convincing evidence that to allow further time for the establishment or reestablishment of the relationship would be contrary to the best interests of the child. Only then may the court proceed to the disposition phase." (Internal quotation marks omitted.) Id., 326–27.

"There are two exceptions to the general rule that the existence of an ongoing parent-child relationship is determined by looking to the present feelings and memories of the child toward the respondent parent. The first exception . . . applies when the child is an infant, and that exception changes the focus of the first step of the inquiry. . . . [W]hen a child is virtually a newborn infant whose present feelings can hardly be discerned with any reasonable degree of confidence, it makes no sense to inquire as to the infant's feelings, and the proper inquiry focuses on whether the parent has positive feelings toward the child. . . . Under those circumstances, it is appropriate to consider the conduct of a respondent parent." (Internal quotation marks omitted.) Id., 327.

"The second exception . . . applies when the petitioner has engaged in conduct that inevitably has led to the lack of an ongoing parent-child relationship between the respondent parent and the child. This exception precludes the petitioner from relying on the lack of an ongoing parent-child relationship as a basis for termination. Under these circumstances, even if neither the respondent parent nor the child has present positive feelings for the other, and, even if the child lacks any present memories of the respondent parent, the petitioner is precluded from relying on [the lack of an ongoing parent-child relationship] as a basis for termination. . . . The interference inquiry properly focuses not on the petitioner's intent in engaging in the conduct at issue, but on the consequences of that conduct. *In other words, the question is whether the petitioner engaged in conduct that inevitably led to a noncustodial parent's lack of an ongoing parent-child relationship*. If the answer to that question is yes, the petitioner will be precluded from relying on the ground of no ongoing parent-child relationship as a basis for termination regardless of the petitioner's intent—or not—to interfere." (Citation omitted; emphasis in original; internal quotation marks omitted.) Id., 327–28.

Applying these principles to the case at hand, the court finds that the department has proved, by clear and convincing evidence, that the child has no positive feelings for or memories of the respondent father.

Indeed, that fact is undisputed. She has never been in his care. She has never met him or even seen him. She would not recognize him if she were to see him now.

Although the father did not expressly raise the issue, the court has considered whether the virtual infancy exception applies in this case. The court concludes that it does not. As stated [previously], the virtual infancy exception applies when the child is "virtually a newborn infant whose present feelings can hardly be discerned with any reasonable degree of confidence . . . ." (Internal quotation marks omitted.) Id., 327. The child's age and ability to express her feelings is assessed as of the time of the termination trial. See id., 329. "To determine whether a petitioner has established the lack of an ongoing parent-child relationship, the trial court must be able to discern a child's present feelings toward or memories of a respondent parent. The virtual infancy exception takes account of the particular problem that is presented when a child is too young to be able to articulate those present feelings and memories. . . . The inability of the court to discern or to be presented with evidence regarding a virtual infant's *present* feelings drives the exception. *That finding must be made at the time of the termination hearing.*" (Emphasis in original; internal quotation marks omitted.) Id.

In this case, at the time of the termination hearing, there was clear and convincing evidence the child was not "virtually a newborn infant." She was two and one-half years old. There was clear and convincing evidence that she is capable of expressing her feelings for the people she regards as family. She refers to her foster mother as "mommy," her foster mother's son as her brother, and her foster mother's parents as her "nana" and "papa." She demonstrates affection and positive feelings for her foster family. Letters from her speech therapist, her physical therapist, her pediatrician, and her Birth to Three developmental therapist all described her trusting relationship with and attachment to her foster mother, as did the testimony of the social worker. Because it is undisputed that the child has no present positive feelings for or memories of Mr. F., whom she has never seen, and because there is clear and convincing evidence that the child's present feelings about parental figures *can* be discerned, the "virtual infancy" exception does not apply.

The court has also considered whether the "interference" exception applies either because the department was unable to locate Mr. F. when he was first mentioned as a possible father in October, 2018, or because the child's mother thereafter repeatedly said that Mr. F. was not the father. The court has previously found that the department's efforts to locate Mr. F. were reasonable under the circumstances, and it now concludes that the department's inability to locate Mr. F. sooner does not constitute "interference." Nor can the mother's

statements directing the department away from the search for Mr. F. be considered as "interference" under *In re Tresin J.* and the cases discussed therein. "Our case law makes clear that the interference exception is akin to the equitable doctrine of 'clean hands' and is triggered only by the conduct of the petitioner rather than that of a third party or some other external factor that occasioned the separation." *In re Tresin J.*, supra, 334 Conn. 332. The clear and convincing evidence establishes that Mr. F.'s separation from the child is a result of his own conduct, from refusing the mother's telephone calls after they broke up to engaging in criminal conduct that resulted in his incarceration in New Hampshire. The petitioner here—the department—did not cause the separation that resulted in the lack of an ongoing parent-child relationship, and the interference exception therefore does not apply.

The court is mindful that incarceration, in and of itself, cannot be the basis for a termination of parental rights, but the court may properly consider the effects of incarceration on a parent's ability to assume a parental role. See id., 325. As the Supreme Court recognized in *In re Tresin J.* and earlier cases, "[e]xtended incarceration severely hinders the department's ability to offer services and the parent's ability to make and demonstrate the changes that would enable reunification of the family. . . . This is particularly the case when a parent has been incarcerated for much or all of his or her child's life and, as a result, the normal parent-child bond that develops from regular contact instead is weak or absent." (Internal quotation marks omitted.) Id. The usual challenges to creating a parent-child relationship that result from incarceration were exacerbated in this case by the fact that Mr. F. was incarcerated out of state when the department located him and has continued to be incarcerated out of state throughout the entire time he has been a party to this case.

It is noteworthy, moreover, that the social worker encouraged Mr. F. to begin to establish a relationship with Emily by writing to her. He told the social worker it was hard because he would not know what to say. He chose not to provide Emily, through the social worker, with even a note or a letter that might tell her something about himself and how he felt about her. He did not ask for the social worker's help in getting mail to Emily or in thinking about what he might say to her.

In sum, the court finds, by clear and convincing evidence, that no ongoing parent-child relationship exists between Mr. F. and Emily, and no exception to this statutory ground applies.

The court now must determine, by clear and convincing evidence, whether "to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." General Statutes § 17a-112 (j) (3) (D). The

Supreme Court has construed this language to mean the time needed "for the [respondent] to meet 'on a day to day basis the physical, emotional, moral and educational needs' " of the child. *In re Juvenile Appeal (Anonymous)*, 181 Conn. 638, 646, 436 A.2d 290 (1980). Among the factors to be considered in deciding whether it would be detrimental to Emily's best interest to allow further time to develop a parent-child relationship with her father are the length of stay in her foster home, the nature of her relationship with her foster parent, the degree of contact maintained with the natural parent, and the nature of her relationship to her natural parent. See *In re Savanna M.*, 55 Conn. App. 807, 816, 740 A.2d 484 (1999).

Our Supreme Court and our Appellate Court have "noted consistently the importance of permanency in children's lives. *In re Juvenile Appeal (Anonymous)*, [supra, 181 Conn. 646] (removing child from foster home or further delaying permanency would be inconsistent with his best interest); *In re Victoria B.*, 79 Conn. App. 245, 263, 829 A.2d 855 (2003) (trial court's findings were not clearly erroneous where much of child's short life had been spent in custody [of commissioner] and child needed stability and permanency in her life); *In re Teshea D.*, [9 Conn. App. 490, 493–94, 519 A.2d 1232 (1987)] (child's need for permanency in her life lends added support to the court's finding that her best interest warranted termination of the respondent's parental rights). Virtually all experts, from many different professional disciplines, agree that children need and benefit from continuous, stable home environments." (Internal quotation marks omitted.) *In re Davonta V.*, 285 Conn. 483, 494, 940 A.2d 733 (2008).

There is clear and convincing evidence that to allow further time for the establishment of a parent-child relationship with Mr. F. would be highly detrimental to the best interest of the child. Emily is now two years and eight months old, and she has been in the department's care since she was ten days old. She has been in the same foster home for her entire life; it is the only home she has ever known. Emily is medically complex and developmentally delayed, and her pediatrician has advised the department and her foster mother that she is likely to experience significant challenges when she is school aged. She is shy and sometimes fearful of strangers, and Mr. F. is a stranger to her. Her physical therapist and her speech therapist have stated that her sense of safety and security with a trusted caregiver has been instrumental in the progress she has made in overcoming feeding difficulties, motor weakness, and speech delays, and that continuity in her care is essential. The developmental therapist who worked with her in the Birth to Three program stated that her mental health would be "negatively compromised and potentially irreparable" if she were to be removed from the consistent and positive environment in which she is

placed.

Whether Mr. F. is released from incarceration in April, 2021, as he hopes, or at some unknown time between April, 2021, and 2023, as is possible based on his Guideline range, he will not be ready to assume a parental role in Emily's life for a substantial period of time after his release. As he admitted at trial, when he is released, he will need to obtain housing and a legal income and engage in services to which DCF can refer him. That is only the beginning. Given his criminal history, consisting of numerous convictions and lengthy periods of incarceration since 1992, he would need to demonstrate that he can avoid further criminal activity and incarceration. It is by no means assured that he will succeed. He would also need considerable education concerning child development generally and Emily's many special needs in particular. To allow such further time for the establishment of a parent-child relationship would indefinitely delay the permanency that is critical to Emily's continued development and well-being. The department has proved, by clear and convincing evidence, that it would be detrimental to Emily's best interest to allow further time for the establishment of a parent-child relationship with Mr. F.

B

DISPOSITIONAL FINDINGS

The court has found, by clear and convincing evidence, that an adjudicatory ground for termination exists because there was no ongoing parent-child relationship as defined by § 17a-112 (j) (3) (D) and to allow further time for the development of such a relationship would be detrimental to the child's best interest. The court must now determine whether clear and convincing evidence establishes that it is in the child's best interest to terminate Mr. F.'s parental rights.

"The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of its environment. . . . In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child." (Internal quotation marks omitted.) *In re Anthony H.*, 104 Conn. App. 744, 764, 936 A.2d 638 (2007), cert. denied, 285 Conn. 920, 943 A.2d 1100 (2008).

In deciding whether continuation of the parental rights of Mr. F. is in the child's best interest, the court has considered the importance and value of the child's genetic bond with her biological father. See *In re Savanna M.*, supra, 55 Conn. App. 816 ("the genetic bond shared by a biological parent and his or her child, although not determinative of the issue of the best interest of the child, is certainly a factor to consider" (inter-

nal quotation marks omitted)). The court has also considered the child's need for sustained stability and continuity in her environment. "Our appellate courts have recognized that long-term stability is critical to a child's future health and development . . . . Because of the psychological effects of prolonged termination proceedings on young children, time is of the essence in custody cases." (Citation omitted; internal quotation marks omitted.) *In re Anthony H.*, supra, 104 Conn. App. 767.

Pursuant to § 17a-112 (k), except where termination is based upon consent, the court is required to make findings as to seven factors. The seven factors set forth in § 17a-112 (k) "serve simply as guidelines to the court and are not statutory prerequisites that need to be proven before termination can be ordered." *In re Quanitra M.*, 60 Conn. App. 96, 104, 758 A.2d 863, cert. denied, 255 Conn. 903, 762 A.2d 909 (2000). As to Mr. F., the court makes the following findings as required by § 17a-112 (k).

### § 17a-112 (k) (1)

*The timeliness, nature and extent of services offered, provided, and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent*

Mr. F. has been incarcerated in New Hampshire since the department located him in July, 2019. The department was therefore unable to refer him to services in the community. The department discussed services available to him in the correctional facility, including substance abuse, mental health, and parenting programs, and recommended that he engage in those programs. Those programs, however, were suspended during the pandemic.

### § 17a-112 (k) (2)

*[W]hether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption and Safe Families Act of 1997, as amended from time to time*

After Mr. F.'s paternity was established, the department made reasonable efforts under the circumstances presented to reunite the family pursuant to the federal Adoption and Safe Families Act of 1997. The social worker contacted him on a monthly basis to provide information about the child, provided photographs of the child to him, assessed his cousin as a placement resource for the child, advised the father to participate in programs to the extent they were available in the correctional facility, and encouraged him to send letters about himself to be shared with the child. His incarceration in New Hampshire made it impossible to refer him for services in the community. His out-of-state incarceration, Emily's young age and fragile health, and the subsequent emergence of a pandemic precluded the

provision of visits.

### § 17a-112 (k) (3)

*[T]he terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order*

The court ordered specific steps for the department and Mr. F. to facilitate reunification. The department complied with its obligations to the extent that it was possible to do so. Mr. F.'s specific steps, and his compliance or lack of compliance with them, were as follows:

- *Keep all appointments set by or with DCF. Cooperate with DCF home visits, announced or unannounced, and visits by the child(ren)'s attorney and/ or guardian ad litem.*

Mr. F. has been incarcerated in New Hampshire throughout the entire time he has been known to the department. He has cooperated with telephone calls from the department.

- *Let DCF, your attorney, and the attorney for the child(ren) know where you and the child are at all time.*

Mr. F. has been incarcerated in New Hampshire since the steps were ordered.

- *Take part in counseling and make progress toward the identified treatment goals: Parenting, Individual, Family. The identified goals are: (1) Create and maintain safe, stable and nurturing home environment free from domestic violence/substance abuse/criminal activity. (2) Learn triggers for substance abuse and alternate coping mechanisms. (3) Understand impact of substance abuse on children. (4) Learn and demonstrate age appropriate parenting skills in the areas of supervision, discipline and developmental expectations. (5) Understand danger that criminal activity presents to children. (6) Develop and implement appropriate coping mechanisms to safely address stressors of parenting. (7) Create and maintain nurturing relationship with Emily. (8) Address mental health needs in individual counseling in order to maintain emotion stability and be a stable resource for Emily.*

Mr. F. has not complied with this step. He remains incarcerated and, before the onset of the pandemic, had not engaged in any services that were available to him at Strafford County Corrections in the areas of substance abuse, mental health, or parenting. The availability of such programs was curtailed after the pandemic began.

- *Submit to a substance abuse evaluation and follow the recommendations about treatment, including inpatient treatment if necessary, aftercare and relapse*

*prevention.*

Mr. F. has not engaged in substance abuse programming.

• *Submit to random drug testing; the time and method of the testing will be up to DCF to decide.*

Mr. F. has not been referred for drug testing because he is incarcerated.

• *Not use illegal drugs or abuse alcohol or medicine.*

Mr. F. denies use of illegal drugs, alcohol, or medicine as he is currently incarcerated.

• *Cooperate with service providers recommended for parenting/individual/family counseling, in-home support services and/or substance abuse assessment/ treatment: Substance abuse treatment at correctional facility; Mental health assessment and treatment at correctional facility.*

Mr. F. has not engaged in substance abuse or mental health services, which the correctional facility suspended as a result of the pandemic.

• *Cooperate with court-ordered evaluations or testing.*

No evaluations or testing have been ordered by the court since the steps were ordered.

• *Sign releases allowing DCF to communicate with service providers to check on your attendance, cooperation and progress toward identified goals, and for use in future proceedings with this court. Sign the release within 30 days.*

Mr. F. has not been asked to sign any releases of information.

• *Sign releases allowing your child's attorney and guardian to review your child's medical, psychological, psychiatric and/or educational records.*

No releases were needed because Emily is committed to the department's care.

• *Get or maintain adequate housing and a legal income.*

Mr. F. is incarcerated and has a job in the correctional facility. He does not have adequate housing or a legal income outside the correctional facility.

• *Immediately let DCF know about any changes in the make-up of the household to make sure that the change does not hurt the health and safety of the child(ren).*

This step did not apply to Mr. F. because he was incarcerated throughout the proceeding.

• *Not get involved with the criminal justice system. Cooperate with the Office of Adult Probation or parole officer and follow your conditions of probation or*

*parole.*

Mr. F. was incarcerated throughout this proceeding. His federal criminal charges remain pending. There was no evidence of new involvement in criminal activity since the steps were ordered.

- *Visit the child(ren) as often as DCF permits.*

The department did not provide visits for Mr. F., who was incarcerated in New Hampshire throughout his involvement in this proceeding.

- *Within thirty (30) days of this order, and at any time after that, tell DCF in writing the name, address, family relationship and birth date of any person(s) who you would like the department to investigate and consider as a placement resource for the child(ren).*

Mr. F. complied with this step. He first proposed an acquaintance in Maine, then proposed a cousin in Hartford as a placement resource.

Having considered the parties' compliance with the specific steps, the court now addresses the remaining factors under § 17a-112 (k).

### § 17a-112 (k) (4)

[*T*]*he feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties*

Emily has never met Mr. F. and has no emotional ties with him. He has never provided any physical care for her. Despite encouragement from the social worker, Mr. F. did not attempt to communicate with Emily by writing letters or cards or having family members provide her with information about him.

Emily has been in the same foster home for two and one-half years, since her discharge from the hospital after her birth. She has been observed by social workers, speech and physical therapists, developmental therapists and her pediatrician to be deeply attached to her foster mother. She calls her foster mother "mommy" and goes to her for comfort when she is upset. The foster mother is willing to adopt Emily if she becomes available for adoption.

### § 17a-112 (k) (5)

[*T*]*he age of the child*

Emily was born on August 5, 2018. She was two and one-half years old as of the date of the termination trial. She is now two years and eight months old.

### § 17a-112 (k) (6)

[*T*]*he efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to*

*make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.*

Since his paternity was adjudicated, Mr. F. has spoken monthly with the social worker. He has proposed placement resources and has asked about Emily's well-being. He has not written to Emily or tried to communicate with her foster parent through the department. Although he inquired about the possibility of visits, he did not move to have visits ordered.

### § 17a-112 (k) (7)

*[T]he extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent.*

Mr. F. has not been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by his economic circumstances of the parent. He refused telephone contact with Ms. M. after their relationship ended. It was his own criminal activity that led to his incarceration and made him unavailable to develop and maintain a relationship with Emily.

The court has carefully considered the seven factors required by § 17a-112 (k) as well as all evidence concerning Emily's best interests in relation to the continuation of Mr. F.'s parental rights. Mr. F. has testified as to his love and concern for his daughter. Our courts have recognized, however, that love and a biological bond is not enough. See *In re Ashley S.*, 61 Conn. App. 658, 667, 769 A.2d 718, cert. denied, 255 Conn. 950, 769 A.2d 61 (2001). A parent must also be able to provide a safe, stable environment. As a result of his criminal conduct, Mr. F. has never been available to provide a home of any kind for Emily, and it is highly unlikely that he will be able to provide a safe, stable environment within any time that is reasonable in light of Emily's needs.

A parent must also be able to recognize and meet his child's developmental needs. It was clear from the evidence that Mr. F. has a limited understanding of the needs of young children generally and of Emily's specific physical, medical, and emotional needs. At the outset of his involvement in the case, he did not think it would cause any problems to move Emily to the home of a stranger in Maine because she was so young. He

became upset with and hung up on the social worker when she attempted to explain the trauma experienced by children with changes in placement. Even at the time of trial, he continued to believe that Emily should be placed with his family rather than with the foster mother, who he acknowledged had provided excellent care. He persisted in this belief even though he had not identified any family member who was willing and able to care for her.

Emily needs a caregiver who is capable of nurturing her, monitoring and attending to her many medical conditions, assisting her in addressing the developmental challenges she currently faces and those she will face as she enters school, and ensuring that she receives the services she will need to continue to develop and grow. Mr. F. is not currently capable of providing such nurture, and it is not foreseeable that he will be able to do so within a reasonable time.

The court has also considered Emily's need for permanence and stability. Mr. F. will have many challenges upon his release from prison, including but not limited to finding legal employment and avoiding further criminal activity. It is not in Emily's best interest to wait for an indefinite but undoubtedly protracted period of time to see if Mr. F. can overcome those challenges.

Considering all the evidence presented, the court finds, by clear and convincing evidence, that continuation of Mr. F.'s parental rights is not in Emily's best interest, and that termination of Mr. F.'s parental rights is in Emily's best interest.

### IV

### CONCLUSION AND ORDERS AS TO THE TERMINATION PETITION

In sum, for all the reasons stated [previously], the court finds, by clear and convincing evidence, a statutory ground exists for the termination of Mr. F.'s parental rights. More specifically, the court finds, by clear and convincing evidence, that the department made reasonable efforts to locate Mr. F., that Mr. F. was unable or unwilling to benefit from reunification efforts, that there is no ongoing parent-child relationship as defined by § 17a-112 (j) (3) (D), and that to allow further time for the establishment of such a relationship would be detrimental to the best interest of the child. The court also finds, by clear and convincing evidence, that termination of Mr. F.'s parental rights is in Emily's best interest. Accordingly, the petition for termination of parental rights is granted. Judgment is entered terminating the parental rights of Mr. F. as to Emily, and the Commissioner of the Department of Children and Families is appointed as Emily's statutory parent. The department shall file, within thirty days, a report as to the status of the child and shall also timely file any additional reports that are required by law.

## V

## PERMANENCY PLAN

On April 6, 2020, after the petition for termination of parental rights had been filed, the petitioner moved for review of a permanency plan for Emily. By objection dated April 15, 2020, Mr. F. opposed the proposed plan.[3] The contested motion was consolidated for trial with the termination of parental rights petition.

The proposed permanency plan is termination of the father's parental rights and adoption. The motion for review is governed by General Statutes § 46b-129 (k) and Practice Book § 35a-14. Under each provision, the commissioner has the burden of proving by a fair preponderance of the evidence that the proposed permanency plan is in the child's best interests. Under the statute, at a permanency plan hearing, "the court shall approve a permanency plan that is in the best interests of the child or youth and takes into consideration the child's or youth's need for permanency. The child's or youth's health and safety shall be of paramount concern in formulating such plan." General Statutes § 46b-129 (k) (2). Practice Book § 35a-14 (d) makes clear that review of a permanency plan is a dispositional question, based on the prior adjudication of neglect. The court must also find that the department has made reasonable efforts to achieve the existing permanency plan. See General Statutes § 46b-129 (k) (4) (F); see also Practice Book § 35a-14 (d). The prior plan, filed May 16, 2019, and approved by the court, *Lobo, J.*, on June 26, 2019, was for termination of parental rights and adoption.

For the reasons discussed [previously] in consideration of the petition for termination of the parental rights of Mr. F., the court finds that the proposed permanency plan of termination of the parental rights of Mr. F. and adoption is in Emily's best interest. The court further finds that the department has made reasonable efforts to achieve the most recent permanency plan. Mr. F.'s objection to the proposed permanency plan is overruled. The motion for review of the permanency plan is granted, and the permanency plan is approved. The clerk shall establish dates for the department to file the next permanency plan and for hearing on the plan and notify the parties thereof.

So ordered.

* Affirmed. *In re Emily S.*, 210 Conn. App.     ,     A.3d     (2022).

In accordance with General Statutes § 46b-124 (b) and Practice Book § 32a-7, the names of the parties to this case are not to be disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and only upon order of the Superior Court.

[1] Where a child's paternity is not known at the time of an adjudication of neglect, the subsequent entry of the father into the proceeding does not invalidate the previous adjudication of neglect. See *In re Zoey H.*, 183 Conn. App. 327, 352–53, 192 A.3d 522 (respondent's later appearance in case did not change historical fact that child was neglected at time of adjudication), cert. denied, 330 Conn. 906, 192 A.3d 426 (2018). Mr. F.'s entry into the ongoing neglect case allowed him to be provided with specific steps and

to participate in any dispositional issues that arose. "[A]n adjudication of neglect relates to the status of the child and is not necessarily premised on parental fault. A finding that the child is neglected is different from finding who is responsible for the child's condition of neglect. Although [General Statutes] § 46b-129 requires both parents to be named in the petition, the adjudication of neglect is not a judgment that runs against a person or persons so named in the petition; [i]t is not directed at them as parents, but rather is a finding that the children are neglected . . . ." (Emphasis in original; internal quotation marks omitted.) *In re T.K.*, 105 Conn. App. 502, 505–506, 939 A.2d 9, cert. denied, 286 Conn. 914, 945 A.2d 976 (2008). At the trial in this matter, no party raised any issue with respect to the neglect adjudication, and the court therefore does not need to address it in this decision.

[2] A Level 3 classification of a child with complex medical needs is defined by the department's practice guide, in relevant part, to mean "a child with a chronic condition that is not well-controlled or which requires daily or regular intensive medical follow-up or treatment, including severe forms of chronic disease such as . . . severe persistent asthma which requires intensive and ongoing medical follow-up or has required an acute hospitalization or [pediatric intensive care unit] admission in the past six months." Department of Children and Families, "Health Care Standards and Practice for Children and Youth in Care," Children with Complex Medical Needs, p. 86, available on the department's website at https://portal.ct.gov/-/media/DCF/Policy/BPGuides/21-5PG-HEALTH-CARE-STANDARDS-AND-PRACTICE-FOR-YOUTH-IN-CARE-PRACTICE-GUIDE.pdf (last visited on April 21, 2021).

[3] Because of the temporary closure of the New Britain juvenile clerk's office at the outset of the pandemic, the objection was not stamped as received until June 1, 2020. Under the circumstances, the objection was timely.

————————————————————